People v Muhammad (2019 NY Slip Op 02609)





People v Muhammad


2019 NY Slip Op 02609


Decided on April 4, 2019


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on April 4, 2019

Renwick, J.P., Tom, Webber, Kahn, Moulton, JJ.


7734 1220/15

[*1]The People of the State of New York, Respondent,
v
Zhakariyya Muhammad, Defendant-Appellant.


Robert S. Dean, Center for Appellate Litigation, New York (Carl S. Kaplan of counsel), appellant.
Cyrus R. Vance, Jr., District Attorney, New York (John T. Hughes of counsel), for respondent.



Judgment, Supreme Court, New York County (Robert M. Mandelbaum, J.), rendered June 24, 2016, convicting defendant, after a jury trial, of sexual abuse in the first degree and endangering the welfare of a child, and sentencing him to an aggregate term of 7 years, affirmed.
On this appeal, defendant's initial argument is that the trial court's responses to notes sent by the jury on the day of the verdict were coercive of that verdict. Specifically, defendant maintains that the trial court gave a coercive response to a note sent by the jury on the day of the verdict by repeating the same Allen charge (see Allen v United States, 164 US 492 [1896]) it had given the preceding day without providing any additional guidance, notwithstanding the jury's specific request for it. Defendant further contends that the trial court coerced the verdict in responding to a note in which the jury requested to continue its deliberations that day by acceding to that request without addressing the scheduling conflicts some of the deliberating jurors had the following week, as first reported to the court in that same note. In addition, defendant maintains that in repeating the Allen charge without responding to the jury's specific request for additional guidance, the trial court failed to "respond meaningfully" to the jury's request (see People v Malloy, 55 NY2d 296, 302 [1982], cert denied 459 US 847 [1982]).
Defendant also contends that the court improperly provided the jury with written copies of the final charge to the jury, improperly considered charges of which defendant was acquitted in determining his sentence, and imposed an excessive sentence.
With respect to the trial court's responses to jury notes and instructions to the jury, on Monday, May 9, 2016, the first day of jury selection, the trial court told the prospective jurors that it anticipated that the jury would be "in a position to decide the case no later than the end of next week," i.e., Friday, May 20, 2016. On Tuesday, May 17, 2016, the trial court distributed written copies of its final charge to the jurors and invited them to "read along" during its reading of the final charge and to take the written instructions into the jury room afterward. The trial court further instructed the jury that the "written copies [were] simply an aid to your absorbing and remembering [the court's oral] instructions" and that if "I deviate in my oral instructions, from the written instructions, in any way, it is the oral instructions you must follow." The trial court further instructed the jury not to "allow your receipt of a written copy to lead you to believe that you may consider only certain portions to the exclusion of others" and that if anything was not understood, the jury must send a note out asking for clarification. Defense counsel raised no objection either to the distribution of the written copies or to the trial court's instructions in that regard. The court then gave the jury its oral final charge, which was identical to the court's written final instructions, and the jury then retired to deliberate. On the morning of Thursday, May 19, 2016, the third day of deliberations, the jury sent a note asking: "[W]hat is the process if we can't come to a unanimous decision[?]" (Court Exhibit IX). The trial court responded by giving an Allen charge. The jury then continued its deliberations.
The following morning, Friday, May 20, 2016, the jury sent a note stating:
"We the jury are still having extreme difficulty coming to a unanimous verdict. We feel it might be helpful to re-hear your guidance from yesterday morning and any additional guidance you have."
(Court Exhibit XI).
Defense counsel moved for a mistrial, and the prosecutor suggested a more forceful Allen charge. The court responded, "I don't know what a stronger [Allen] charge would look like," noting that he had previously given "the full strong [Allen] charge." The court concluded, "I'm just going to give them the [Allen] charge. None of you have any suggestions as additional guidance . . . is that right?" Defense counsel answered, "That's right." The trial court then repeated its Allen charge to the jury a second time without offering any additional guidance.
At 12:28 p.m., the jury sent out a further note, requesting readback of certain testimony of the complaining witness and her grandmother (Court Exhibit XII). The court provided the readbacks and then instructed the jury to break for lunch and to return at 2:15 p.m.
When the jury returned, the court announced that "we're going to need to break for the day at this point. So I will ask you to cease your deliberations." The court then asked the jury to "please be back Monday morning at 9:30." On returning to the jury room, however, the jury sent out another note (Court Exhibit XIII) stating:
"We the jury request to continue deliberating until 5:00 PM. or 6:00 PM. because we are at a critical juncture[.] Also, multiple people have conflicts next week & they are -
[First Juror] - out of state Monday & Tuesday
[Second Juror] - out of country beginning Monday for three weeks
[Third Juror] - out of country beginning Thursday
[Fourth Juror] - out of state from Monday thru [sic]
June 5th"
(Court Exhibit XIII).
Upon receiving Court Exhibit XIII, the trial court told the parties: "We will let [the jurors] keep deliberating." At that point, defense counsel moved for a mistrial, arguing that the existence of the scheduling conflicts could result in last-minute pressure on the jury. The court responded that the jury had stated that it was at a critical juncture in its deliberations, knew the issues it had to address, asked for readback, and expressed the view that it could resolve the case if it were given a few more hours to deliberate that day.
The trial court then read Court Exhibit XIII in the presence of the jurors and told them: "Your wish is our command. You may resume [your] deliberations." The jury resumed its deliberations.
At 4:35 p.m., the jury sent out a note stating that it had reached a verdict (Court Exhibit XIV). At the request of defense counsel, the court polled the jury, and each juror indicated consent to its verdict, which was not guilty of the two top counts of predatory sexual assault against a child and guilty of the counts of sexual abuse in the first degree and endangering the welfare of a child. Defense counsel made no further objections, and the court accepted the jury's verdict.
On or about June 9, 2016, defendant moved to set aside the verdict pursuant to CPL 330.30(2). In support of his motion, defendant submitted a sworn statement from one of the jurors (the statement juror). According to the juror's statement, on the afternoon of Friday, May 20, 2016, after the court instructed the jurors to cease deliberations until the following Monday "without the court inquiring or instructing the jury as to what would happen if the entire jury could not reach a verdict within the next two to three hours," the jurors "all began to speculate as to what could happen to the jurors if we could not arrive at a verdict before Monday." The statement juror further averred that she had been the jury's lone holdout for acquittal on the sexual abuse in the first degree count but, after the court's announcement of its intent to adjourn [*2]deliberations to Monday, changed her vote from not guilty to guilty "because of the coercive pressure that was thrust upon me by the remaining jurors." The court denied defendant's CPL 330.30(2) motion, reasoning that the statement juror's description of the pressure she felt from other jurors to change her vote could not be used to impeach the verdict.
On this appeal, defendant does not challenge the trial court's ruling on his motion to set aside the verdict. Rather, he relies on the sworn statement of the statement juror to support his claim that the trial court coerced the verdict by merely repeating the same Allen charge it had given the preceding day without offering any additional guidance in response to the jury's request that morning and by allowing the jury more time to deliberate that day, as requested in Court Exhibit XIII, without directly addressing the scheduling conflicts of some of the jurors as set forth in the same note.
We begin our inquiry by examining whether the trial court's second Allen charge was, by its terms, or in the circumstances under which it was given, coercive of the jury's verdict. The substance of an Allen charge is not coercive if it is "appropriately balanced and inform[s] the jurors that they [do] not have to reach a verdict and that none of them should surrender a conscientiously held position in order to reach a unanimous verdict" (People v Hardy, 26 NY3d 245, 252 [2015]). Here, the trial court's repeated Allen charge included an instruction that the jurors were to "make every possible effort to arrive at a just verdict," thereby implicitly instructing the jurors that they were not required to reach a verdict if they did not all agree that the verdict was just. Further, the trial court advised the jury that it "was not asking any juror to violate his or her conscience or to abandon his or her best judgment." Defendant raised no objection to the language of the Allen charge either time it was given. Thus, neither in the trial court nor on this appeal does defendant take the position that the language of the court's Allen charge was inconsistent with the Hardy definition of a noncoercive charge.
Moreover, the jury expressly requested to "re-hear" the court's Allen instructions. Notably, this jury note did not advise the court of any deadlock. Rather, it was only a request for further guidance as to resolving present differences of opinion. The trial court repeated its Allen charge in response to that request, rather than at its own instance. Thus, both the language of the Allen charge and the circumstances under which it was repeated demonstrate that the charge was not coercive.
Defendant further contends that the trial court coerced the verdict by acceding to the request made in Court Exhibit XIII for more time to deliberate on the day of the verdict without immediately addressing the scheduling conflicts set forth in the same jury note in which the request was made. The record reflects that in making its request for more time, the jury informed the court that it had reached a "critical juncture" in its deliberations. Although the better practice would have been to address the juror's scheduling conflicts by attempting to devise a means to accommodate them, the only request the jury actually made was to be allowed to continue its deliberations until 5:00 p.m. or 6:00 p.m. that day because it was at a "critical juncture." As the record reflects, the trial court construed Court Exhibit XIII as meaning that the jurors thought that they could quickly resolve any remaining differences among them and agree upon a verdict within hours that same day, and therefore permitted them to do so. Thus, there was no need for the court to address the traveling plans of some jurors for the following week because this did not appear to be a problem at the time. The court's view was supported by the fact that after its rereading of the Allen charge that morning, the jury had sent Court Exhibit XII requesting the readback of testimony, indicating that its deliberations were continuing. Further, after the jury had requested the opportunity to deliberate until 5:00 p.m. or 6:00 p.m., and the court had granted that request, the jury did not send out any follow-up note inquiring as to the continuation of deliberations if the jury were unable to reach a verdict by 6:00 p.m. that evening. The jurors were fully aware that they could have done so, as indicated by the jury's having sent out Court Exhibit IX the preceding day inquiring about what the process would be if the jury did not come to a unanimous decision. The jury did not bring to the court's attention any doubts about or dissatisfaction with the court's response to Court Exhibit XIII. The jurors' advice to the court that they were at a "critical juncture" of the deliberations and their request that deliberations continue until 5:00 p.m. or 6:00 p.m. were clear indications of the likelihood that a verdict would [*3]be reached before the close of the day. Indeed, the jury was able to announce its verdict at 4:35 p.m., prior to the end of the additional period afforded for its deliberations.
The cases cited by our dissenting colleague each involve clear instances of improper coerciveness not found in the acts of the trial court here (see People v Diaz, 66 NY2d 744, 746 [1985] [singling out lone dissenting juror and questioning whether that juror's doubt was reasonable, as majority of jurors, who were "equally as intelligent" and "observant" and came "from equal backgrounds," had no doubt, and directing that deliberations "continue until such time [as] I decide that they should not continue"]; People v DeJesus, 134 AD3d 463, 465 [1st Dept 2015] [directing juror solely responsible for his child's care to report for continued deliberations the following week notwithstanding juror's fruitless search for alternative child care]; People v Nelson, 30 AD3d 351, 352 [1st Dept 2006] [after jury had engaged in more than two days of deliberations without sequestration and had received Allen charge after advising court at end of each day that it was deadlocked, directing jury to return next morning for further deliberations and to prepare for possible overnight sequestration if no verdict reached by end of following day]).
Furthermore, even if we were to agree with our dissenting colleague that the court failed to provide a meaningful response to the request made in Court Exhibit XIII by not addressing the scheduling conflicts, such action would not constitute reversible error, as the court's failure to respond to the jury's request did not seriously prejudice defendant's rights (People v Jackson, 20 NY2d 440, 454-455 [1967], cert denied 391 US 928 [1968]; cf. People v Lourido, 70 NY2d 428, 435 [1987] [defendant was seriously prejudiced by court's providing no response at all to jury's request for readback of victim's cross-examination]).
Additionally, the court did not order the jury to continue its deliberations on Monday. Rather, the court's announcement that the jury would cease its deliberations that Friday and continue them on Monday was issued prior to the court's being advised for the first time, by way of Court Exhibit XIII, of the jurors' scheduling conflicts. The court's grant of the jury's request in that note for more time to deliberate that afternoon effectively overrode the court's earlier direction that the jury cease deliberations that day and continue them on the following Monday.
Further, the statement juror's description of feeling pressured into changing her dissenting vote would not normally present an exception to the general rule that a "verdict may not be impeached by probes into the jury's deliberative process" (People v Maragh, 94 NY2d 569, 573 [2000]; cf. Peña-Rodriguez v Colorado, __ US __, 137 S Ct 855, 869 [2017] [narrow exception for "overt racial bias"]). This principle is especially applicable where, as here, the jury was polled at the taking of the verdict (see People v Goode, 270 AD2d 144, 145 [1st Dept 2000], [posttrial statement by juror complaining of coercion not proper basis for impeaching verdict under CPL 330.30, in view of juror confirmation of the verdict upon polling of the jury], lv denied 95 NY2d 835 [2000]; People v Redd, 164 AD2d 34, 38 [1st Dept 1990]).
In this case, the trial court's denial of defendant's CPL 330.30 motion is not before us, because that issue has not been raised, but we are asked to consider this juror's post-verdict statement as background evidence of coercion. Assuming, without deciding, that we may do so, the credibility of the statement is undermined by the record, which shows that the statement juror was polled at defense counsel's request, and on her oath swore that the verdict accurately reflected her views. As noted, defense counsel raised no contemporaneous objection to the taking of the verdict.
Defendant further asserts that, in repeating the Allen charge on the day of the verdict without providing the jury with the additional guidance it mentioned in Court Exhibit XI, the trial court failed to "respond meaningfully" to the jury's request (see People v Malloy, 55 NY2d at 302). Because defense counsel raised no objection to the trial court's response at the time it was given, this claim is unpreserved and we decline to review it. As an alternative holding, we reject it. The jury's specific request was that the court provide "any additional guidance you have." Here, where the record makes clear that the trial court, after seeking suggestions for additional guidance from both counsel, had no such guidance to offer, "[t]he court was not obligated to go beyond the jury's specific request" (People v Jiminez, 244 AD2d 289, 289 [1st Dept 1997], lv denied 91 NY2d 927 [1998]). Moreover, the jury never stated that its concerns remained [*4]unsatisfied by the trial court's rereading of its original instructions without any further instructions or guidance (see People v Williams, 150 AD3d 902, 904 [2d Dept 2017], lv denied 29 NY3d 1038 [2017]).
Defendant also challenges the provision by the court of written copies of its complete final jury charge. Counsel offered no objection when the court announced its intention to distribute the charge, or when the court invited exceptions to its charge, which included the detailed limiting instructions on the use of the written charge. Accordingly, this claim is unpreserved, and we decline to review it in the interest of justice (see People v McFadden, 162 AD3d 501, 501 [1st Dept 2018], lv denied 32 NY3d 939 [2018]).
Further, we reject defendant's argument that the court's distribution of written copies of the final charge without defense counsel's consent constituted a mode of proceedings error not subject to preservation analysis. This is not a case such as People v Miller (18 NY3d 704 [2012]), People v Collins (99 NY2d 14 [2002]) or People v Damiano (87 NY2d 477 [1996]), all of which involved mode of proceedings errors with respect to unauthorized annotations of or court instructions pertaining to verdict sheets in contravention of applicable law (see CPL 310.20). Neither is this a case where the trial court erred in providing the jury with written copies of a complete final charge, or portions thereof, over the defendant's objection (cf. People v Johnson, 81 NY2d 980, 982 [1993] [provision to jury of copies of entire charge over the defendant's objections violates CPL 310.30]; People v Owens (69 NY2d 585, 591-592 [1987] [provision to jury of written copies of portions of jury charge over defendant's objection constitutes reversible error]). Here, where defense counsel gave implied consent and where the trial court provided the jury with careful and detailed instructions concerning the use of the written copies of the charge, and there is no showing of prejudice, preservation analysis is applicable (McFadden, 152 AD3d at 502).
Additionally, defendant contends that this matter should be remanded for resentencing because the sentencing court improperly considered the counts of predatory sexual assault against a child, of which he was acquitted. Defendant concedes, however, that his trial counsel did not preserve this issue, and we decline to review it in the interest of justice. As an alternative holding, we reject it. When the court stated at sentencing that the trial evidence revealed that defendant "acted as a "predator," it made clear that "defendant was acquitted of the predatory sexual assault against a child counts" and that it was using the term "predator" only "in the colloquial sense" (see People v Rivers, 262 AD2d 108, 108 [1st Dept 1999] ["court carefully and explicitly stated on the record that it was imposing sentence solely upon the charges as reflected in the jury's verdict"], lv denied 94 NY2d 828 [1999]).
We perceive no basis for reducing the sentence.
All concur except Renwick, J.P. and Moulton, J. who dissent in part in a memorandum by Renwick, J.P. as follows:




RENWICK, J.P. (dissenting in part)


After a week of jury deliberations, the jury rendered a split verdict; it convicted defendant of sexual abuse in the first degree and endangering the welfare of a child, and it
acquitted him of the two charges of predatory sexual assault
against a child. On this appeal, the majority affirms defendant's conviction, rejecting defendant's primary argument that the trial court committed numerous errors during jury deliberations that deprived him of a fair trial [FN1]. I agree with the majority that the trial court's two Allen charges provided to the deadlocked jury during deliberations were appropriate.
Likewise, I agree that the trial court acted properly by distributing copies of the final charge to the jury with defense counsel's implicit consent.
In my view, however, the trial court committed reversible error by creating a substantial risk of jury coercion during jury deliberations. Specifically, at the end of the day on Friday, knowing the jury remained deadlocked, even after two Allen charges, and having been informed that three jurors had extended travel plans beginning the following Monday, the court nevertheless granted the jury's request to continue deliberations that afternoon without addressing the schedule conflict presented by the travel plans.
Factual and Procedural Background
This is not a typical case where the jury had no difficulty reaching a verdict. These were extensive jury deliberations that carried on for almost an entire week. At the outset of jury selection, which began on Monday, May 9, 2016, the court told the prospective jurors: "I anticipate in this case you will all be in a position to decide the case no later than the end of next week," i.e., Friday, May 20, 2016.
The jury began deliberations the following Tuesday, May 17, and continued the next day, sending various notes requesting medical records. The jury requested readback of the victim's testimony about certain incidents. It also requested readback of the guardian's testimony about the victim's post-traumatic behavior, among other things.
On the third day of deliberations, Thursday, May 19, the jury sent a note, marked 11:37 a.m., asking: "[W]hat is the process if we can't come to a unanimous decision[?]" The court proposed an Allen charge. Defense counsel stated that "to give them an Allen would be more coercive than instructive," given that it was "noon on Thursday" and the jury had been deliberating since "11:30 a.m. on Tuesday." The court responded, "I believe it would be instructive because they've never been given the Allen . . . and it's the first time they said they are having difficulty." The court gave an Allen charge.
The next morning, Friday, May 20, 2016, the court noted that at the end of the day on Thursday, after the parties had left, "an anonymous juror, who would not give her name, sa[id] she was feeling stressed in the jury room and wanted to speak to the judge. She was told to come in this [Friday] morning and tell an officer that she wanted to speak to the judge and that would be worked out." She responded, "I'll sleep on it and maybe I'll be okay in the morning." The court stated that no juror had requested to speak with the court that morning and concluded "presumably she's okay."
The jury's first note on Friday, which did not indicate the time but was apparently sent before a subsequent 12:28 p.m. note, stated: "We the jury are still having extreme difficulty coming to a unanimous verdict. We feel it might be helpful to re-hear your guidance from yesterday morning and any additional guidance you have."
Defense counsel moved for a mistrial, and the prosecutor suggested "a more forceful Allen charge." The court responded, "I don't know what a stronger Allen charge would look like," noting that the court had previously given "the full strong Allen charge," not a "modified or abbreviated Allen." The court suggested that it was "implicit" in the first Allen charge that at some point the jury would need to stop if it was unable to reach a verdict. The court concluded: "I'm just going to give them the Allen charge. None of you have suggestions as additional guidance . . . is that right?" Defense counsel said, "That's right." The court then repeated the prior Allen charge to the jury.
At 12:28 p.m., the jury requested readback of the victim's and her guardian's testimony about certain incidents. The court responded to those requests, then instructed the jury to take a lunch break and return at 2:15 p.m.
When the jury returned to the courtroom, the court announced an end to the deliberations for the day and ordered the jury to return on Monday at 9:30 a.m., but then, the jury sent a note with the time incompletely written as "2:"  suggesting that the note was written sometime after the break ended at 2:15 P.M. and before 3:00 p.m. This note stated: "We the jury request to continue deliberating until 5:00 p.m. or 6:00 p.m. because we are at a critical juncture[]. Also, multiple people have conflicts next week": one juror would be "out of state from Monday thru [sic] June 5th"; another would be "out of country" for three weeks beginning on Monday; a third [*5]would be "out of state" on Monday and Tuesday; and a fourth would be "out of country" beginning Thursday.
The court told the parties, "We will let them keep deliberating." At that point, defense counsel moved for a mistrial arguing that "the scheduling conflicts are a problem [] that could lead to a last minute pressuring." The court responded, "They specifically say they are at the critical juncture. They know . . . what the issues are. They asked for readback. They think they can resolve this. . . . They are asking for a few more hours in fact. So I will give them a few hours they requested."
The court then read the note to the jurors and told them, "Your wish is our command. You may resume your deliberations." The jury's next note, marked 4:35 p.m., stated: "We the jury have reached a verdict." The court accepted the verdict after individual polling upon defense counsel's request.
On or about June 9, 2016, defendant moved to set aside the verdict pursuant to CPL 330.30(2). Although defendant does not argue on appeal that the court should have granted that motion, it is relevant on appeal because it was supported by a statement, notarized June 7, 2016, by the juror who was noted as having plans to leave the state until June 5, beginning on the Monday following the Friday when four jurors noted their travel plans. This juror averred that she had "anticipated professional disruptions: a conference attendance obligation on May 31 in Montreal and a presentation on June 6 in New York." She recalled that jurors "all began to speculate" about what would happen if they failed to reach a verdict that day, including whether travel plans would need to be canceled or whether the jury would be ordered to resume deliberating after a "hiatus." The juror stated that she was the only juror who wanted to acquit defendant of first-degree sexual abuse, until she changed her vote after deliberation was extended on the last day. She stated that she "always" believed that the evidence did not prove defendant's guilt of that offense beyond a reasonable doubt, but she succumbed to pressure from other jurors. She also believed that this was the only "sensible choice" after the court did not "declare a mistrial after two deadlock notes."
The court denied defendant's motion to set aside the verdict at sentencing on June 24, 2016. As to the juror's statement, the court stated, "I don't know who drafted this for her," but whoever did so was incorrect that the jury sent two "deadlock notes," since the notes did not use the words "deadlocked" or "hopelessly," but merely expressed "difficulty" reaching unanimity. This appeal ensued.
Discussion
During deliberations, the jury may, at any time, request from the court further instructions or information with respect to the law, with respect to the content or substance of any trial evidence, or with respect to any other matter pertinent to its consideration of the case (CPL 310.30). Although the court has discretion in determining how best to respond to the request, that discretion "is circumscribed . . . by the requirement that the court respond meaningfully to the jury's request" (People v Malloy, 55 NY2d 296, 302 [1982], cert denied 459 US 847 [1982]). In determining whether a response is meaningful, courts should consider "the form of the jury's question, which may have to be clarified before it can be answered, the particular issue of which inquiry is made, the supplemental instruction actually given and the presence or absence of prejudice to the defendant" (id.). The failure to provide a meaningful response constitutes reversible error where the defendant has been prejudiced by it (People v Lourido, 70 NY2d 428, 435 [1987]).
Here, unlike the majority, I would find that by merely directing the jury to continue deliberations on Friday afternoon, without addressing the scheduling conflict that was first raised by the jury in the same note seeking an extension of time to deliberate that afternoon, the trial court failed to "respond meaningfully to the jury's request for further instruction or information" (People v Malloy, 55 NY2d at 302; see CPL 310.30). While the court's Allen charges had mentioned the possibility of ordering a new trial before a different jury, this did not negate the court's duty to address the scheduling conflict, because the court also ordered the jury to continue deliberating for a fifth day, Monday. That instruction, in the absence of any response to the scheduling conflicts, strongly suggested to the jurors with conflicting travel plans that they might [*6]need to cancel those plans. These circumstances raised a substantial likelihood that the jury rushed to agree to a verdict due to social pressure to avoid compelling three of their peers, and potentially a fourth, to cancel their travel plans (see People v Nelson, 30 AD3d 351 [1st Dept 2006]; People v DeJesus, 134 AD3d 463, 465 [1st Dept 2015]).
Ultimately, in responding to the jury note that revealed the scheduling conflict, the trial court failed to make an informed choice from the available alternatives. When defense counsel moved for a mistrial based on the reasonable concern that impending travel plans of four jurors (including three jurors scheduled to leave the state the following Monday) could lead to a coercive atmosphere, there were various ways the jurors' conflicts could have been accommodated by the trial court. For instance, the court could have granted defense counsel's motion for a mistrial. There were also less drastic remedies, such as directing the jury to continue deliberating over the weekend or ordering the jurors who had conflicting travel plans to cancel those plans. Any of the foregoing alternatives would have been preferable to the court's response to jury notes on the fourth and final day of deliberation, which exerted undue pressure on the jury to reach a verdict.
The majority's finding  that the circumstances here did not pose an inherent potential risk of a coerced verdict that needed to be addressed by the court  is not persuasive and is unsupported by the record. The majority reasons that the trial court properly ignored the jury's revelation of a scheduling conflict because the court reasonably construed the subject note "as meaning that the jurors thought that they could quickly resolve any remaining differences among them and agree upon a verdict within hours that same day." It seems the majority misses the point. Whether the trial court surmised that the jury might reach a verdict that day did not eliminate the coercive atmosphere created by the jurors' concern over their conflicting schedules and the trial court's omission of a response to their concerns. Importantly, we must evaluate the possibility of jury coercion from the perspective of the jurors with the conflicting schedules, not the trial court. The inherent coercive potential of the circumstances as they play upon the minds of the jurors must be considered in order to determine whether the court's action created, exacerbated, or alleviated the situation (see People v Diaz, 66 NY2d 744, 746 [1985]; People v DeJesus, 134 AD3d at 465; People v Nelson, 30 AD3d 351).
Here, from the perspective of the jurors who were experiencing, as they conveyed in their jury notes, "extreme difficulty coming to a unanimous verdict" and who had "multiple people" with scheduling conflicts, certainly it was reasonable to surmise, from the timing of the court's instruction to continue deliberations without addressing the schedule conflicts presented by the travel plans, that a verdict was being demanded before the unavailable jurors would be excused to attend to personal matters. These circumstances created an unacceptably high risk of a coerced verdict: any juror would be too preoccupied to give serious attention to analyzing the evidence and arriving at a personal opinion of guilt or innocence and consequently would simply fall in line with whatever view prevailed among the other jurors, in order to bring the case to a conclusion. Thus, the court's failure to address the scheduling conflict created a substantial possibility that any juror might forsake his or her duties to deliberate on the merits of the case in favor of promptly reaching a disposition.
Still, the majority argues that "there was no need for the court to address the traveling plans of some jurors for the following week because this did not appear to be a problem." Yet, the very purpose of a jury note is to convey problems, questions, concerns, and issues weighing heavily on the minds of the jurors during the jury deliberations, a critical stage of the trial. Nonetheless, the majority essentially seems to be arguing that the fact that several jurors alerted the judge to their travel plans was not a real expression of their legitimate concerns of a schedule conflict. Like the trial court, the majority fails to appreciate the effect on the jurors' minds of the court's conduct of sending the jurors back to deliberate without addressing the schedule conflict affecting one-third of the jurors, as revealed in their note.
Again, it cannot be overstated that the overriding concern here is whether the jurors with schedule conflicts could reasonably construe the circumstances as coercive. There is every reason to believe that the jurors with conflicts would have perceived the failure to address their schedule conflicts as nothing less than what it appeared to be: a judicially enforced continuation [*7]of the deliberative process until a verdict was reached, even if that meant continuing the next Monday. This threat of continuing deliberations could not be overcome, as the majority suggests, by "indications of the likelihood that a verdict would be reached before the close of the day." The position taken by the majority fails to come to grips with the fact that the court's representation that the following Monday could be devoted to jury duty, in direct conflict with some of the jurors' travel plans, had the clear capacity to cause jurors to reach a verdict based on considerations of jury convenience rather than on the weight of the evidence.
Nor, unlike the majority, would I find assurances that the jury was not coerced simply because it returned the verdict at 4:35 p.m., well before 6:00 p.m. Although the court broadly said, "Your wish is our command," the court was not entirely clear about whether it would end at 5:00 p.m. or extend deliberations to 6:00 p.m. after the jury requested either time. If the jury had expected that it might only have until 5:00 p.m. that Friday, the jurors might have felt that their time was almost up at 4:35 p.m. Even if the jurors believed they had until 6:00 p.m., that hardly refutes the probability that the jurors rushed to agree on a verdict for the sake of ending their participation in the trial rather than genuinely resolving their differences of opinion.
Our evaluation of whether jury coercion undermined a verdict should focus on probabilities, not certainties. Indeed, our analysis is guided by the fundamental legal principle that a defendant in a criminal proceeding has the right to a trial by his peers who are free to deliberate and make an independent personal judgment as to guilt [FN2]. Circumstances creating a substantial risk of juror coercion undermine the exercise of independent personal judgment during jury deliberations (see e.g. People v DeJesus, 134 AD3d at 465). Hence, verdicts potentially traceable to jury coercion should not stand.
Here, of course, we cannot know for sure whether the conflicting jurors surrendered to the pressure to be free or whether other jurors compromised their views to accommodate their own needs or to accommodate their fellow jurors. It is sufficient that the court's granting of the jury's request to continue deliberations, without addressing the scheduling conflict presented by the travel plans of a third of the jurors, created a substantial risk of distracting the jury in its deliberations. Although exactly how the jury was divided was not revealed to the trial court, we can safely infer that a minority of the jurors (at least one) was not initially in favor of a guilty verdict, as suggested by the lengthy deliberations and the need to provide the jurors with two Allen charges. The fact that the jurors had trouble reaching a verdict indicates that to them, at least, the case was not as open and shut as it appears to the majority. Under the circumstances, a substantial risk of a coerced verdict was present here.
Moreover, while the court was correct that the description by the juror who made the statement of feeling pressured into changing her dissenting vote would not normally present an exception to the general rule that a verdict may not be impeached by probes into the jury's deliberative process, the juror's account of the jury room after the deliberation was extended provided further support for an inference that a substantial risk of a coerced verdict was present here.
Finally, the majority's holding that the trial court did not have to address the potential coercive atmosphere is at odds with People v DeJesus (134 AD3d 463), a recent case presenting similar facts. In DeJesus, this Court concluded that circumstances analogous to those in this case were impermissibly coercive. This Court explained:
"The court . . . indicated that the jury would likely continue deliberating into the next week although jurors had been told during jury selection that the case would be over by the aforementioned Friday, raising concerns for one juror who was going to start a new job the following Monday and another juror who was solely responsible for his child's care in the first three days of the next week. After the court informed the latter juror that he would be required to show up the next week despite the juror's purportedly fruitless efforts to obtain alternative childcare, and then brought the juror back into the courtroom solely to reiterate that point more firmly, the jury apparently returned its verdict within less than nine minutes, at about 3:29 p.m. on the Friday. The totality of the circumstances supports an inference that the jury was improperly coerced into returning a compromise verdict" (id. at 465 [citations omitted]).
In the instant case, the court was apparently not aware of such specific information about the jurors' travel plans and whether they might have been able to reschedule their plans, due to its failure to address the travel conflicts on the record. In the absence of further details, the court could have presumed that at least the two jurors who planned to be out of the state or country for about three weeks beginning the following Monday had plans that would have been impractical to change at the last minute. These circumstances were analogous to that of the juror in DeJesus who had been unable to find childcare for the Monday following the Friday when the note was sent. To be sure, the instant case involving a child witness's testimony about sexual conduct is more complex than DeJesus, a "one-witness identification case" of assault (id. [internal quotation marks omitted]). However, even if the sheer length of deliberations here was not objectively unusual, what is more significant is that the jurors were likely surprised and frustrated at being ordered to continue deliberating into the week after the date by which the court had originally anticipated that their obligations would end.
In short, the constitutional guarantee of trial by jury contemplates a jury free of judicial or other coercion. The events in this case reflect the unfortunate and substantial possibility that some jurors were improperly coerced by an improper supplemental instruction.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: APRIL 4, 2019
CLERK



Footnotes

Footnote 1: In addition to seeking a new trial, defendant seeks resentencing upon the grounds that the sentencing court improperly considered the counts of which he was acquitted and that his sentence was excessive. Because I believe that defendant was denied a fair trial, I do not reach these arguments.

Footnote 2: The right to an impartial jury has long been recognized by both the United States Supreme Court and the New York Court of Appeals as one of the most fundamental rights guaranteed to the accused (see e.g. Irvin v Dowd, 366 US 717, 722 [1961] [indicating that when the accused is denied a fair hearing by an impartial jury "even the minimal standards of due process" are violated]; People v McQuade, 110 NY 284, 300 [1888] [referring to "the fundamental rule that an accused person is entitled to be tried by a fair and impartial jury"]).